UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NUMBER 19-20551-CR-MORENO

UNITED STATES OF AMERICA,

Plaintiff, **Courtroom 13-3**

vs. **Miami, Florida**

ERIC LIN, **June 23, 2020**

Defendant.

**SENTENCING PROCEEDINGS VIA ZOOM VIDEOCONFERENCING
BEFORE THE HONORABLE FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE**

**VIDEOCONFERENCING APPEARANCES:**

**FOR THE GOVERNMENT:** **Jonathan Kobrinski, AUSA**
United States Attorney's Office
99 Northeast Fourth Street
Miami, Florida 33132
305-961-9074
Fax: 305-530-7976

**FOR THE DEFENDANT:** **CHRISTIAN S. DUNHAM, AFPD**
Federal Public Defender's Office
150 West Flagler Street
Suite 1700
Miami, Florida 33130
305-530-7000
Fax: 305-536-4559

**REPORTED STENOGRAPHICALLY BY:** **GILDA PASTOR-HERNANDEZ, RPR, FPR**
Official United States Court Reporter
Wilkie D. Ferguson Jr. US Courthouse
400 North Miami Avenue - Suite 13-3
Miami, Florida 33128 305-523-5118
gphofficialreporter@gmail.com

TABLE OF CONTENTS

Page

Reporter's Certificate .................................... 23

EXHIBITS

| Exhibits | Marked for Identification | | Received in Evidence | |
|---|---|---|---|---|
| Description | Page | Line | Page | Line |

(The following proceedings were held at 9:43 a.m.:)

THE COURT: Good morning, everybody. It's 9:45. We start at 9:45 to give everybody the 45 minutes to get ready, and I assume 45 minutes is enough with all the experience that everybody has had in other courtrooms, but we'll see.

The first case is 19-20551-Criminal, United States of America versus Eric Lin.

Mr. Lin, is that you there? I see you.

THE DEFENDANT: Yes, it is, Your Honor. It's me.

THE COURT: The defendant is present. And his lawyer?

MR. DUNHAM: Good morning, Your Honor. Christian Dunham. I'm an Assistant Federal Public Defender.

THE COURT: Mr. Dunham is present on the other screen. And the Government.

MR. KOBRINSKI: Good morning, Your Honor. Jonathan Kobrinski on behalf of the United States.

THE COURT: Okay. You have a still photo. You're not moving, but I can hear you and I can see you in the still photo.

Anyone else who's present?

MR. KOBRINSKI: We have the probation officer, Your Honor.

THE COURT: Will the probation officer please state her name for the benefit of the record?

THE PROBATION OFFICER: Good morning, Your Honor. Jamie Johnson on behalf of the United States Probation Office.

THE COURT: Okay. Anyone else?

SPECIAL AGENT JONES: Good morning, Your Honor. Special Agent Jones with the FBI.

THE COURT: Okay. I can't see you, but it says FBI agent. That's fine. All right.

SPECIAL AGENT PEREZ: Good morning, Your Honor. Yoberto Perez with the FBI. I'm also here present with the victim.

THE COURT: Okay. And I did read a letter from the victim and we'll get through that in just a minute, but the first thing is, Mr. Lin, I see your lawyer has filed a consent to appear by video or audio teleconference. That's what we're doing and it cannot be further delayed without serious harm to the interest of justice under Rule 32. So I assume that you agree with that since it has your signature from back in April 23rd. Am I right, sir?

THE DEFENDANT: You're right, Your Honor. I agree.

THE COURT: All right. So that will be filed.

Mrs. Christie, I signed it. So I'll give it to you.

Okay. The first obligation of the Court, of course, is to read the Presentence Investigation Report and make sure that the defendant has read it.

Have you had a chance to read it, Mr. Lin, the report?

THE DEFENDANT: Yeah, I've gone over it several times, Your Honor.

THE COURT: Okay. The probation officer says it's an adjusted offense level 20, Criminal History Category III on Count 4 because, according to the Plea Agreement, Counts 1, 2, 3, 5 and 6 were going to be dismissed or there was going to be a request by the Government to dismiss it.

Any objections from the Government to the Presentence Investigation Report?

MR. KOBRINSKI: No, Your Honor.

THE COURT: Any objections from the defense?

MR. DUNHAM: Yes, Your Honor. There's one housekeeping matter first which it wasn't filed, but I believe the Government and I agreed to it. The arrest date on the PSI, Page 2, says something like November or December. He was actually arrested on August 16 in Seattle, and Mr. Kobrinski verified that I believe with the FBI agent. So just in terms of giving him proper credit, we wanted to change the PSI to the correct arrest date of August 16.

THE COURT: Government agrees?

MR. KOBRINSKI: That's correct, Your Honor. I apologize. Yes, Your Honor.

THE COURT: So change on Page 2, November 4 to August 16 of the same year.

THE PROBATION OFFICER: Yes, Your Honor.

THE COURT: All right. Any objections? And without any other objections then, after having read and reviewed the

Presentence Investigation Report, also I've read the defendant's father's letter. That was filed and I have read Clara Alvarez Alonso's statement as well.

THE PROBATION OFFICER: Your Honor, I think there were some resolved objections.

THE COURT: I'm sorry?

THE PROBATION OFFICER: I think there were some other unresolved --

MR. DUNHAM: That's correct, Your Honor.

THE PROBATION OFFICER: -- objections.

THE COURT: Hold on. Hold on. Hold on. I asked the defendant if there were any objections. What has the defense lawyer said about that?

MR. DUNHAM: There is one more objection we need to discuss.

THE COURT: Then raise it. What is it?

MR. DUNHAM: It's the six-point enhancement for evidencing an intent to actually commit the crime of violence. We filed an objection, Your Honor. There are three cases that we cited in the objection.

The facts are that my client sent $377 to an accomplice in Pennsylvania.

THE COURT: What were the facts as presented at the plea, at the guilty plea, the plea colloquy? What was the factual basis?

MR. DUNHAM: The factual basis was that he sent $377 to an accomplice in Pennsylvania.

THE COURT: Okay. And your objection is that under Section 2A6.1(b)(2), those offenses did not evidence an intent to carry out such threat, right?

MR. DUNHAM: That's correct, Your Honor.

THE COURT: What was the meaning of it?

MR. DUNHAM: Well, actually, initially the meaning -- he sent the money initially for this accomplice to beat up some totally different person that worked at the same restaurant as the victim, but not the victim. Then after he sent the money, then it changed to, okay, this is like a down payment for you to do harm to the victim. So initially it wasn't even for the victim, but then it changed to the victim.

THE COURT: What do I do with the quote, "I will stop

at nothing until you, your family, your friends, your entire worthless Latin race is racially exterminated?"

What do I do with that statement?

MR. DUNHAM: Well, he's delusional, Your Honor. This is stuff he says all the time. The way his dad explains it, he says a lot of grandiose things, but he's not a violent guy. He's never going to do anything. They never --

THE COURT: Well, how do we determine what his intent is except through his words?

MR. DUNHAM: I mean, I understand. They never did

anything else in terms of trying to surveil the victim, you know, actually fly down here. The guy was in Pennsylvania he sent the money to, and my client was in Seattle. So I just don't think it's enough to get this particular enhancement. I don't think they did enough.

The cases I cited are cases where people went and traveled to Washington D.C. with ammunition and did a lot more than just sending $377 to someone.

THE COURT: And they said a lot more, too.

MR. DUNHAM: He said a lot. My client said a lot.

THE COURT: No, no. So the other cases are different because your client has made multiple threats and, in addition, he has a prior record of doing that, too, right?

MR. DUNHAM: He does.

THE COURT: Okay. What does the Government wish to say?

MR. KOBRINSKI: Your Honor, there's not much we need to add to our response. I am glad to articulate the critical factors including that when you send somebody else, another individual, money, you're setting into action a chain of events that you're going to lose control over in some part because now he's paid somebody to do this heinous act.

When he asked him initially to kidnap a co-worker, that is part and parcel of the threats because the threats include, you're going to see the Hispanic race exterminated and then I'm

going to kill you, and so that, in and of itself, is part of the threat. And then when it shifts to, here's how you kidnap her, and he's giving her the playbook, it's just furthering that.

So when you look at the various factors in terms of manifesting his intent, I think Your Honor already stated, how else are we going to gauge whether he has that intent if but for the actions and statements he makes. And so under these facts and circumstances and in light of the repeated nature of the threats to this individual that both predate and post date the payment that was made to this individual, it's clear he's manifested that specific intent.

THE COURT: All right. What does the defense wish to say, if anything?

MR. DUNHAM: Nothing further, Your Honor. We laid it out in our objections. We just don't -- we don't believe it's sufficient.

THE COURT: Okay. I overrule the objection. I think it is sufficient. There were multiple conversations. The statements are not ambiguous, they're pretty specific, that lasted over a certain period of time. It was involving several people. The fact that there was even a recruiting, the threatening communications to kill all Hispanics in addition to one individual is very different from the Scott case, and I'm going to overrule the objection and find that it is enough.

Any other objections by the defense?

MR. DUNHAM: Nothing that's going to make a difference in terms of the guidelines, Your Honor. There was one other objection, but we don't --

THE COURT: Go ahead.

MR. DUNHAM: No, we don't --

THE COURT: Go ahead. What is the other objection?

MR. DUNHAM: We're going to waive it at this point. Either way, he'd be in Criminal History Category III, so it doesn't really matter.

THE COURT: It's up to you.

MR. DUNHAM: We'll waive it at this point.

THE COURT: Okay. So having done that, the total offense level is 20, Criminal History Category III, and the guideline range is 41 to 51 months.

The next obligation of the Court is to apply Title 18, United States Code Section 3553(a) and decide where within the guidelines, below the guidelines or above the guidelines, all the way up to five years, I should sentence the defendant. The probation officer recommends the top of the guidelines of 51 months.

What say the Government? What do you wish to say?

MR. KOBRINSKI: Your Honor, we are recommending -- and I did file a brief memorandum -- an upward variance in this case. We believe the statutory maximum is appropriate. My memorandum which is very brief was at I believe Docket Entry 31.

THE COURT: When did you file that?

MR. KOBRINSKI: It was filed last week. I'm looking at it right now. It's on June 18th, Your Honor.

THE COURT: Okay. And the grounds are what?

MR. KOBRINSKI: The grounds are -- and whether you look at this as an upward variance or as a departure, which my footnote references, the only footnote in the memo, this individual -- and the Government recommends a variance, but it could be an upward departure because the basis for the upward departure that his criminal history is significantly underrepresented his likelihood of recidivism, is borne out by the offense conduct in this case directly.

In 2013 -- and this is documented I believe at paragraph 22 of the PSI, from paragraphs 18 to 22 -- he was sending anti-Semitic threats to the other victim, MI, in this case, the victim from Washington, D.C., and that's not represented in his criminal history anywhere. And then six years later, he starts threatening her again, and so he recidivates in the course of this own instant offense, but then when you look at what he did with respect to CI and the victim from Miami, the repeated nature of the threats, the repeated circumstances and the language in there that's used, the fact that he also paid -- he'd been convicted, not of that 2013 offense, but he's been convicted elsewhere, yet he does this again.

And then in his post-Miranda statement, he talks about how he thought what he was doing was protected communications. He needs -- it's not even close to protected communications. What he did was awful and it was beyond mere words and the words obviously being threatening words. And so he needs a specific message that the Court is not going to tolerate this, you've already been convicted of this, you've been convicted several times. It's getting worse for you. This time it's going to be five years under the Government's submission and next time it might be even more. So there should not be a next time.

And in light of that concern about the prospect of another next time, the Government also recommends the full period of supervised release and two additional special conditions. They're outlined in the memo as well, Your Honor. The special conditions for supervised release that we believe are appropriate is no contact with any victim who's named in the PSI whether from this case or from previous cases. He's not to contact them whatsoever or their family members. And then secondly, that his permissible search be extended in the way that they often are in computer crimes in the manner that's suggested in the PSI.

THE COURT: What say the defense?

MR. DUNHAM: Your Honor, we're asking for a sentence of 41 months at the bottom of the guidelines. I think just to note for Mr. Lin, the most important thing to note from the PSI is

his mother, his background, and his mother had a bipolar disorder like Mr. Lin. His mother was in a mental hospital when she died. Speaking to the family and Mr. Lin, unfortunately, that kind of passed on from his mother to him, but also, you know, these are words and they're bad and they're crimes, but luckily, it doesn't appear that he's actually going to ever do anything violent.

His dad is involved. His dad lives in Baltimore, Maryland. He wanted to be present, but obviously, he just wrote the letter. Mr. Lin has a bad history, but this is the situation of a person that needs help and treatment, and incarceration, frankly, is going to not -- I don't necessarily see what it's going to do to him, but he needs help, he needs treatment, he needs mental health treatment, he needs medication, and I think the situation with his mother can kind of explain why he is the way he is.

He got fixated on this young woman, and he wrote thousands and thousands and thousands of pages. I have the discovery. It's voluminous in terms of all the messages that he sent her, and it's bad, but it's obviously just evidence of a delusion because, I mean, who sends literally thousands and thousands of messages a day to someone who's not mentally ill or who's not delusional? It's really clear.

So I think a sentence of 41 months followed by the supervised release is appropriate. I don't necessarily think

it's legal to have him not contact any victim on any case. I think obviously he shouldn't be allowed to contact the victim on this case or the mother or the family. I'm not so sure about the legality of the Court restricting him from talking to any victim on his past cases. I don't know about the jurisdiction of that.

But that's it, Your Honor. We're asking for 41 months and followed by the supervised release.

THE COURT: Mr. Lin, what do you wish to say before I sentence you?

THE DEFENDANT: Nothing, Your Honor.

THE COURT: All right. Well, I have read the Presentence Investigation Report. I'm going to read aloud the letter from your father and also the letter from the victim. Even though it's part of the Presentence Investigation Report, I think it's appropriate to read it.

Your father, Jay Cheng says, "Dear Judge Moreno: My name is Jay Cheng," C-h-e-n-g, "and I'm the father of the defendant Eric Lin. I'm very sorry that Eric broke the law. My sincere apologies go to the victim and the family.

"Eric Lin lived with me for most of his life. He is not a physically violent person though he likes bluffing and talking something outlandish on the Internet. He previously had emotional problems with girls but he never used any physical violence.

"I understand that Eric Lin has violated the law and is to be sentenced by the court. I wonder as the country is experiencing the COVID-19 pandemic if the Court could sentence him to probation. I'm willing to help to provide the residence for him to serve in probation. Respectfully, Jay Cheng."

Clara Alvarez Alonso also provided a statement that reads as follows:

"Please consider this in sentencing the man who not only threatened my life, but that of my family. Nothing can undue the harm that he caused me and my mother. I still fear for my life as does my mother. Over a very short period of time I received over 150 pages of threats on my life as well as direct threats to my family. These threats made to me in writing by Eric Lin were overly graphic and gruesome and I became scared for my life. The threats were constant and unrelenting.

"As I live in close proximity to the restaurant where I used to work where Eric Lin frequented, I was extremely worried that he knew my whereabouts which caused a general sense of stress and panic in my household. My mother started having recurring breakdowns and would beg that I not go anywhere by myself in Uber, by foot or otherwise. She even started having symptoms induced by stress that forced us to spend hours at the emergency room.

"When we learned that Lin had offered to pay someone to kidnap me, the sense of stress we felt only increased. We were paralyzed by fear as a direct result of the direct threats that he made to me. This situation with Mr. Lin made me feel unsafe at all times. It took a toll on my independence. I no longer felt like I could carry on with my normal life. I felt like I should be watching over my shoulder at all times. Not only did it impact me and my mother, but it impacted our friends and family."

I see that something happened to the video by Eric Lin. What happened? It's because it's 10:00?

THE MARSHAL: Your Honor, actually, yesterday when I was in magistrate court, they dropped off three times. So I'm going to give them a call, and let them know that they dropped off.

(There was a brief discussion off the record.)

THE MARSHAL: Your Honor, they're reconnecting right now.

THE COURT: Okay. Mr. Lin is back. You got disconnected I think when I was reading Ms. Alonso's statement.

"Not only did it impact me and my mother, but it impacted our friends and family. It became so consuming that no one felt safe in my presence. My family and friends began adapting their lives so that when we got together, it would be at someone's house instead of in public. They felt

like my safety and security were at risk. These threats continued for over a month.

"Every time I heard my phone receive a notification, I was afraid it would be another threat. Mr. Lin's threat made my loved ones and I live in a state of fear and uncertainty.

"While he is now in jail, I fear that as soon as he is released, he will come after me. I understand that there are limits on the amount of time that he can remain in jail, but I urge you to consider the impact he has had on my life and that he will have in the future. The threats he made to me were real and life-altering.

"Thank you for considering my thoughts."

I have, of course, considered her thoughts and the thoughts of the father. I've considered also the fact that the mother had mental health problems as well and the entire Presentence Investigation Report. But following 3553(a), I do think an upward variance is appropriate. Even without the request by the Government -- not a departure because there's no need to go that route. It's actually harder to prove a departure. But the prior record is significant. It's understated and perhaps, more importantly, it's the same type of thing. We are not talking about using marijuana or using cocaine or even stealing a car.

The problem is back in 2008 on paragraph 38 at 23 years

old, the repeated calls in Baltimore County in Maryland and then the harassment on April 10, 2008, also in Baltimore County and then on April 28, 2008 repeated calls and he received three years' imprisonment, but was released a few months later. And then there was the burglary, and he has received a criminal history point for that.

But the harassing phone calls, the nature, the extent, the impact, frankly, it would be my inclination to give more than the five years, but the defense lawyer obtained a Plea Agreement from the prosecutor to dismiss Counts 1, 2, 3, 5 and 6, so I cannot do that. That's the benefit to the defendant. But we need to protect the public. The prior record justifies it.

He does have some mental health problems, obviously, but they keep on -- the offenses keep on recurring, the impact on the victim is very serious, and we need to protect the public.

I'm considering all the 3553(a) factors, and in doing that, I think a 60-month sentence, five years, is appropriate in this case. The period of supervised release, the maximum I think I can give him is three years. And, of course, he's not to have any contact with the victim or the mother or any of the family members.

What I'm going to do is prohibit him from having any access to the Internet. This is what we do with people who

sometimes have child pornography cases. In this case, that's not his issue. His issue is he likes to make threats. Some people can live without the Internet. It's not a constitutional right to have access to the Internet. It's only for a period of three years, not for life. That way I avoid the issue of whether he can have contact with other victims in Baltimore County or in other places back from 2008. He just will not have contact to the Internet. Unfortunately, the Internet, even under the protection of the First Amendment, has some things that perhaps encourage people to make threats, especially if they have mental health problems and that is an issue. I'm not banning people from writing things on the Internet, just him because of the prior record and for this instance and only for the limited amount of time that I can, the three years.

In addition, of course, the standard conditions with the probation office of reporting and of the typical search and making sure that he doesn't have access to the Internet.

Now that I -- and there's $100 special assessment. He cannot afford to pay a fine, so there's no point in it.

Any objections to the manner of imposition of sentence or the sentence itself from the Government?

MR. KOBRINSKI: No, Your Honor.

THE COURT: From the defense?

I can't hear you. If I could read lips, I could, and maybe if we do this for a long time, I'll learn.

MR. DUNHAM: I forgot to unmute myself. Sorry, Your Honor.

THE COURT: That's okay. That's the right thing to do to keep the vibes out. So you're right. I've done it, too.

MR. DUNHAM: We do object, Your Honor, to the six-point enhancement for evidencing an intent to carry out. We believe the evidence is insufficient and we object to the upward variance. And also --

THE COURT: All right. And it's preserved.

MR. DUNHAM: Thank you.

My client also would like me to ask the Court to recommend that he go to either Butner or any other mental health BOP facility.

THE COURT: I think that's a good idea. So I'll recommend Butner, and the objection is preserved.

You have the right to appeal, Mr. Lin, and your lawyer will file an appeal if you want him to for the six-level enhancement and for the slight upward variance. It was slight. I would intend to have done more, but I couldn't do more. Do you understand that, sir?

THE DEFENDANT: I know, Your Honor.

THE COURT: Okay. Do you want to tell him whether you want to appeal now or do you want to do it later?

THE DEFENDANT: I mean, we might do an appeal. It really depends on what my lawyer wants to do because, frankly, I

think five years for what I did is pretty fair considering the impact on the victim.

Now, I was totally conscious of all these threats, but in my mind I just wanted power over the victim for her to say, stop sending me these threats, because I was thinking, well, she'll go to law enforcement. And then I had a friend of mine who was from Barcelona, he said, that's my ex-girlfriend. She has no papers. She's not going to go to no FBI. Stop being a pussy. You do whatever you want. But he said, be careful because you might end up in prison. I'm like, I got you, Edward. Yeah, that's it. I should have listened to him. He said, be careful.

THE COURT: All right. Well, listen for the future because you're still young. My words are probably of little impact, but at least it makes -- I think most judges, especially me, say these things to satisfy ourselves more than anything else, unfortunately. But I will -- it's better not to say anything. The Fifth Amendment should have been first. That way you would just not say anything, but that's why no Internet once you're released afterwards, but it's up to you and your lawyer to file that, but you have 14 days. So make sure.

All right. Anything else? Sorry it took so long with the little gap. All right.

THE DEFENDANT: So Your Honor will recommend -- Your Honor will recommend I go to Butner?

THE COURT: Yes, yes.

THE DEFENDANT: FMC, Federal Medical Facility? Okay, thank you.

THE COURT: It has a lot of mental health and physical health treatment.

THE DEFENDANT: Yes.

THE COURT: So I think that's good for you. All right.

MR. KOBRINSKI: Your Honor, in light of the statement of reasons you issued and also the mention of the fact that you would have considered even going higher had there been another count, would you consider a King finding in this case, that in light of the six-level, if it hadn't applied, you would have imposed the same sentence, because it sounds like that's what you were saying with your statement?

THE COURT: I would impose the five years, too, no matter what because I think it should be --

MR. KOBRINSKI: Whether it applied or not?

THE COURT: So the question --

MR. KOBRINSKI: Thank you.

THE COURT: -- I would have for you is, why did you ask to dismiss the other counts? But you are the prosecutor, not me. So I will not. It's a good job done by the defense lawyer and probably considered the background and the family, not having to go to trial. I don't get involved in that because federal judges cannot plea bargain, but I obviously -- and the

defendant apparently even agrees with that, so I give him credit for that and he got acceptance of responsibility. Let's hope he does better afterwards.

Thank you, folks.

THE DEFENDANT: Thank you.

THE COURT: We're in recess and we're late for our 10:00.

MR. DUNHAM: Thank you, Your Honor. Have a great day.

THE PROBATION OFFICER: Your Honor, have a good day.

THE COURT: All right.

MR. KOBRINSKI: Bye.

THE COURT: Okay. Are we still on? Okay. I find that the waiver of appellate rights was freely, voluntarily entered and that the defendant is represented by competent counsel with whom he has expressed satisfaction. Okay.

(The hearing concluded at 10:13 a.m.:)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of proceedings in the above-entitled matter.

01-18-21
DATE

GILDA PASTOR-HERNANDEZ, RPR, FPR
Official United States Court Reporter
Wilkie D. Ferguson Jr. U.S. Courthouse
400 North Miami Avenue, Suite 13-3
Miami, Florida 33128 305.523.5118
gphofficialreporter@gmail.com